# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

ANTONIO L. SIMMONS,

                Petitioner,

      v.                                    Case No. 07-CV-604

MICHAEL THURMER,

                Respondent.

_____

# ORDER

On July 2, 2007, Antonio L. Simmons ("Simmons") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his 2001 Wisconsin state conviction for recklessly endangering safety while using a dangerous weapon. In his petition, Simmons asserts three grounds for relief:[1] (1) that his Fourteenth Amendment due process rights were violated when he was denied a request for a new trial based on new evidence; (2) that he was deprived of effective assistance of trial counsel in violation of the Sixth Amendment; and (3) that his appellate counsel on direct appeal was also ineffective. Before addressing the merits of Simmons's petition, the court reviews the procedural and factual background of Simmons's case.

---

[1] Although Simmons lists six separate grounds for relief, the court finds that grounds three through six of Simmons's petition present the same issue; that is, whether Simmons's trial and appellate counsel were ineffective.

## BACKGROUND

Sometime in the early morning hours of July 8, 2000, Simmons was involved in a heated argument with James Gray ("James") at a tavern located near the corner of North 42nd Street and West Capital Drive in Milwaukee, Wisconsin. The argument soon turned violent, with James smashing his partially filled glass of Hennessey cognac over Simmons's head. A bouncer at the tavern intervened and told James and his sister, Precious Gray ("Precious"), to leave while Simmons remained in the tavern. James and Precious, along with Precious's friend Andrea Crawley ("Crawley"), left the tavern and got into Precious's black Pontiac Grand Am. Minutes later, a white two-door car approached Precious's car, and its occupant opened fire on James, Precious and Crawley. In a hail of bullets, Precious was hit once, and James was hit eight times. (Court of Appeals Decision, March 13, 2007, ¶ 2, Answer Ex. B, Docket #21).

The shooting victims and the tavern's bouncer alerted police of the incident, and identified Simmons as the shooter. (Court of Appeals Decision, July 30, 2004, ¶ 3). Police later arrested Simmons and he was charged in Milwaukee County Circuit Court with three counts of recklessly endangering safety while using a dangerous weapon in violation of Wis. Stat. §§ 941.30(1)-(2) and 939.63.[2] At trial, the prosecution called six witnesses.

_____

[2]The Wisconsin Court of Appeals' opinions in this case also refer to an additional charge of being a felon in possession of a weapon, to which Simmons pled guilty. (Court of Appeals Decision, July 30, 2004, ¶1, Answer Ex. E, Docket #21). However, Simmons has not challenged the validity of his guilty plea on that charge.

Case 2:07-cv-00604-JPS   Filed 03/27/09   Page 2 of 26   Document 58

James testified that Simmons came up to him in the tavern and pushed him, and that he responded by knocking Simmons over the head with his drink. After others broke up the fight, James stated that he left the tavern with his sister Precious, and her friend Crawley. As they left the area in Precious's car, James testified that a small white car pulled up along the passenger side of Precious's car. From the rear passenger seat of Precious's car, James testified that he got a good look at Simmons before the bullets started flying. James also recalled Simmons telling him to die as Simmons shot at him. On cross-examination, Simmons's attorney questioned James on the number of drinks he had before the shooting, on certain details about the shooting, and on James's past juvenile delinquencies. (Transcript, February 6, 2001, 17-56, Answer Ex. J 44B, Docket #21).

Precious generally corroborated James's testimony, testifying that she witnessed Simmons confront James in the tavern and that James hit Simmons on the forehead with his drink. Precious stated that both Simmons and James seemed drunk and that she thought Simmons might have been carrying a gun in the tavern. She also stated that James wanted to fight Simmons outside the tavern, but that James eventually got into the backseat of her car to leave. Precious testified that she was driving away from the tavern when Simmons drove up in a white car and started firing. Precious stated that she and Crawley abandoned the car by rolling out of the driver's side door onto the ground. Precious also claimed to have seen Simmons again as he drove away from the scene in the white car. On cross-examination, Precious confirmed that she knew Simmons prior to the evening of the

shooting, and that Simmons had come over to her house on two or three occasions. (Transcript, February 6, 2001, 54-111, Answer Ex. J 44B, Docket #21).

Crawley also testified that she was in the tavern during the initial confrontation between James and Simmons, and that she left the tavern soon after with James and Precious. From the front passenger seat of Precious's car, Crawley claimed she saw Simmons shooting out the driver's side window of a white two door car. Crawley stated that she then ducked and followed Precious out the driver's side door of Precious's car. Crawley stated that she did not know Simmons prior to that evening and, on cross-examination, Crawley admitted that she saw the shooter for less than a second and identified Simmons from a photo array presented to her hours after the shooting. (Transcript, February 6, 2001, 111-27, Answer Ex. J 44B, Docket #21).

Tyrone Ramsey ("Ramsey"), the bouncer that intervened after James hit Simmons with his glass, testified that Simmons and James were frequent customers at the tavern. Ramsey stated that he knew both men only through their visits to the tavern. Ramsey testified that, on the evening of the shooting, he and the other bouncers separated James and Simmons because "some blows was thrown" between the two men. Ramsey claimed that he told James and his sister Precious to leave, and that Simmons was kept in the tavern for ten to fifteen minutes after James and Precious left. Ramsey also stated that upon Simmons leaving the tavern, Ramsey witnessed another man try to slip Simmons what Ramsey identified as a .25 caliber handgun. Ramsey claimed he then saw Simmons get into a white

two-door car and later witnessed Simmons outside that car shooting a gun at the car carrying James and Precious. Shortly after the shooting, Ramsey gave a description to police of Simmons and of the white car he was driving. Ramsey also admitted that he had been convicted of a crime in the past. On cross-examination, Ramsey stated that he had knowledge of weapons from his work and the military, and he stated that he did not think the gun Simmons used in the shooting was a .25 caliber based on the number of shots he heard. (Transcript, February 6, 2001, 128-53, Answer Ex. J 44B, Docket #21).

Milwaukee Police Detective Kevin Armbruster ("Armbruster") also testified at Simmons's trial. Armbruster stated that he responded to a police pursuit of a white two-door car matching the description of a car driven by the suspected shooter. Armbruster testified that by the time he caught up with the vehicle, the driver had abandoned the white Chevrolet Cavalier eleven blocks from the scene of the shooting. Armbruster said that he recovered several bullet casings from inside and around the Chevy, including casings originating from .38 caliber and 9 millimeter weapon. He stated that technicians who checked the vehicle recovered no identifiable fingerprints. Armbruster also confirmed that a woman near the vehicle was questioned about the driver of the vehicle. (Transcript, February 7, 2001, 11-42, Answer Ex. J 45B, Docket #21).

The final witness called by the prosecution was Milwaukee Police Lieutenant Michael Dubis ("Dubis"). Dubis testified that he responded to the scene of the shooting outside the tavern, and found six .38 caliber shell casings near Precious's

bullet-riddled Pontiac. Dubis further testified that police testing indicated that the markings on the casings found at the scene were consistent with the markings on the .38 caliber casing found in the white Chevy. (Transcript, February 7, 2001, 43-62, Answer Ex. J 45B, Docket #21).

Finally, Simmons called his friend John Lindsey ("Lindsey") as a defense witness. Lindsey testified that he drove Simmons to the tavern on the evening of the shooting. Lindsey claimed he saw Simmons immediately after James hit Simmons with his drink, at which point Simmons was bleeding from a gash in his forehead. Lindsey stated that he left the tavern with Simmons about fifteen minutes after James and Precious left, and that he and Simmons got into Lindsey's red Oldsmobile Cutlass to go to the hospital. As they drove away, Lindsey testified that he noticed two cars on the street, with gunfire coming from one of the cars. Lindsey testified that when they arrived at the hospital, however, Simmons did not want to go inside because Simmons said he had outstanding arrest warrants. On cross-examination, Lindsey admitted that he never told his story to police. (Transcript, February 7, 2001, 63-77, Answer Ex. J 45B, Docket #21).

After deliberating for just under an hour, the jury returned a guilty verdict on two counts of first degree recklessly endangering safety by use of a dangerous weapon, and one count of second degree recklessly endangering safety by use of a dangerous weapon. (Transcript, February 7, 2001, Answer Ex. J 46B, Docket #21). Before sentencing, Simmons moved for a new trial based on new evidence and ineffective assistance of counsel. Simmons attached an affidavit from a woman

named Zakea Jones ("Zakea"), who claimed responsibility for the shooting. Apparently, Zakea was Simmons's girlfriend and was in the tavern during the initial altercation between Simmons and James. She also claimed to have been in the white Chevy Cavalier on the night of the shooting with someone who went by the name of "C-Note." (Zakea Aff., Pet'r Ex. 33, Docket #43). At the sentencing hearing, Simmons appeared with a new appointed counsel and asked for an evidentiary hearing while asserting many of the same points he now makes in his habeas petition. (Transcript, June 11, 2001, Pet'r Ex. 38, Docket #43). The circuit court denied Simmons's motion and sentenced him to twenty-six years in prison to be followed by thirteen years of extended supervision. (Judgment, June 15, 2001, Answer Ex. A, Docket #21).

In February and March of 2003, Simmons moved to modify his sentence and for a new trial. Simmons included two additional affidavits from alleged witnesses Sherie Purifoy ("Purifoy") and Kina Jackson ("Jackson"). In her affidavit, Purifoy stated that she was in the tavern on the night of the shooting, and saw Simmons get into a "Red Cutlass" automobile driven by someone she knew only as John. (Purifoy Aff., Pet'r Ex. 3, Docket #43). Jackson averred that she too was in the tavern that evening, and saw Simmons get into the passenger side of a car driven by "an unknown male" and drive off east on Capital Drive. (Jackson Aff. Pet'r Ex. 4, Docket #43). Based on these affidavits, Simmons asked the circuit court to grant him a new trial. Simmons also argued that the trial judge improperly imposed a harsher sentence because the judge believed Simmons had manipulated his girlfriend Zakea

-7-

into making a false confession. In an opinion dated May 9, 2003, the Milwaukee County Circuit Court denied Simmons's motions, finding that the evidence against Simmons was overwhelming, and that any presumption that Simmons was responsible for Zakea's attempted confession had adequate support in the record. The circuit court also found that Simmons's sentence was not excessive, and that the affidavits of Jackson and Purifoy did not create a reasonable probability of a different trial result if the two were to testify at a new trial. (Order, May 9, 2003, Pet'r Ex. 40, Docket #43).

Simmons appealed to the Wisconsin Court of Appeals, claiming that the circuit court erred in denying his request for an evidentiary hearing to determine whether a new trial was warranted, and in denying Simmons's request for resentencing. In a decision dated July 30, 2004, the Wisconsin Court of Appeals affirmed the circuit court's order. The court of appeals denied Simmons's claim that he was entitled to a new trial, and held that the affidavits of Purifoy and Jackson "at most . . . established a *possibility* that a new trial could produce a different result, not a 'substantial degree of probability' that it would do so." (Court of Appeals Decision, July 30, 2004, ¶17, Pet'r Ex. 29, Docket #43) (emphasis in original). The court also denied Simmons's request for resentencing, holding that Simmons had not shown that the sentencing judge relied on inaccurate information or that the sentence was otherwise unjustifiable. (Court of Appeals Decision, July 30, 2004, ¶¶ 27, 39, Pet'r Ex. 29, Docket #43).

Simmons then filed a motion in Milwaukee County Circuit Court seeking further postconviction relief for ineffective assistance of trial counsel and appellate counsel. In support of his motion, Simmons attached affidavits from three witnesses, Toronto Wooten, Clebern Peel and Tawanda Jones, all of whom claimed to have witnessed the fight between Simmons and James in the tavern, and all of whom also claimed to have seen Simmons get into the passenger seat of a red car and leave the area. (Wooten, Peel and Jones Aff., Pet'r Ex. 5-7, Docket #43). Simmons also submitted the affidavit of Elijah Brooks ("Brooks"), who similarly claimed to have witnessed Simmons getting into a red car, but who also claimed to have seen a different unidentified man shooting from a white car. (Brooks Aff., Pet'r Ex. 2, Docket #43). A fellow inmate of both Brooks and Simmons completed his own affidavit stating that he heard Brooks say that someone other than Simmons shot James. (Pet'r Appellate Br. App., Answer Ex. D, Docket #21).

Simmons argued that his trial counsel was ineffective for myriad reasons, and that his appellate counsel was ineffective for not raising the issue of Simmons's trial counsel performance on direct appeal. The circuit court found that Simmons had waived his claims of ineffective assistance of trial counsel because he did not raise them on direct appeal. In its order, the circuit court considered and rejected Simmons's claims of ineffective assistance of appellate counsel, finding Simmons had failed to establish any prejudice resulting from his counsel's alleged shortcomings. (Order, January 3, 2006, Pet'r Ex. 30, Docket #43). The circuit court

denied Simmons's motion for reconsideration, and Simmons once again appealed. (Order, February 7, 2006, Pet'r Ex. 31, Docket #43).

On appeal, the Wisconsin Court of Appeals affirmed the circuit court. The court of appeals held that the affidavits provided by additional witnesses did not warrant a new trial because any new evidence those witnesses might have provided was unlikely to lead to a different result. The court of appeals also found that Simmons was negligent in not discovering the alleged evidence sooner, since the affidavits were all made by Simmons's friends. On Simmons's ineffective assistance of counsel claims, the court of appeals held that Simmons had waived his claims of ineffective assistance of trial counsel, and that Simmons's appellate counsel was not ineffective. (Court of Appeals Decision, March 13, 2007, Answer Ex. B, Docket #21). Simmons appealed to the Wisconsin Supreme Court, which denied review on June 12, 2007. (Answer Ex. C, Docket #21).

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, governs the federal courts' authority to issue writs of habeas corpus. Under AEDPA, when a constitutional claim is adjudicated on the merits by a state court, a federal court may only grant habeas relief if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or if the state court's determination of the facts was unreasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Therefore, a court reviewing a habeas petition must evaluate the reasonableness of

the state court's decision, and not merely whether the state court decision was incorrect or erroneous in its result. *See Williams v. Taylor*, 529 U.S. 362, 410-12 (2000). All factual determinations of the state court are presumed correct unless the petitioner rebuts such determinations by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Before a federal court may address the merits of a habeas petition, the petitioner must fairly present his or her federal claims in state court. *See Baldwin v. Reese*, 541 U.S. 27, 29, 32 (2004) (holding a "prisoner does not fairly present a claim to a state court if that court must read beyond a petition or a brief . . . in order to find material" that alerts it to the presence of a federal claim). The court now turns to the specific claims presented in Simmons's petition.

**1.    Newly Discovered Evidence**

In his petition, Simmons asserts that newly discovered evidence in his case requires that he be granted a new trial under the Fourteenth Amendment of the Constitution. The Wisconsin Court of Appeals rejected this argument on state law grounds, finding that the additional evidence Simmons presented did not meet Wisconsin's five-part test for granting a new trial. (Court of Appeals Decision, March 13, 2007 ¶¶ 7-8, Answer Ex. B, Docket #21). Although Simmons included newly discovered evidence as a separate ground for relief in his petition, Simmons has not developed this argument in either his brief in support or reply brief. In general, newly discovered evidence relating to the guilt of a state prisoner is not an independent ground upon which the court may grant habeas relief. *See Johnson v. Bett*, 349 F.3d 1030, 1038 (7th Cir. 2003) (citations omitted). Rather, such evidence must

-11-

relate to a constitutional violation separate and apart from any claim of innocence. *Id.* Therefore, the court declines to consider the newly discovered evidence Simmons puts forth as an independent ground for granting habeas relief.

## 2.    Ineffective Assistance of Trial Counsel

In his petition, Simmons claims that his appointed trial counsel, Michael Chernin ("Chernin"), was ineffective for the following reasons: (1) failing to investigate and call potential witnesses to testify in support of Simmons's alibi; (2) failing to file a notice of alibi pursuant to Wisconsin statute; (3) failing to consult with Simmons on trial strategy; (4) failing to adequately impeach and cross-examine testifying witnesses for the prosecution; (5) failing to introduce prior inconsistent statements of testifying witnesses for the prosecution; and (6) failing to seek exclusion of certain prosecution witnesses.

In considering Simmons's postconviction motion to vacate, set aside or correct his sentence, the Wisconsin Court of Appeals held that Simmons had waived his right to directly challenge the effectiveness of his trial counsel because he had not raised the issue on direct appeal. Under Wisconsin law, prisoners must raise any available grounds for relief in an initial postconviction motion or direct appeal, unless there exists a sufficient reason for failing to raise an issue in an original motion or appeal. *See Wisconsin v. Escalona-Naranjo*, 185 Wis.2d 168, 185-86 (1994) (citing Wis. Stat. 974.06(4)). The court of appeals held, however, that a successful claim of ineffective assistance of appellate counsel could overcome such a procedural default. (Court of Appeals Decision, March 13, 2007, ¶ 11, Answer Ex. B, Docket

-12-

#21). The court of appeals then found that, as a matter of federal law, Simmons's postconviction counsel was not ineffective because Simmons had not suffered prejudice as a result of his postconviction counsel's decision not to raise the issue of ineffective assistance of trial counsel on direct appeal. (Court of Appeals Decision, March 13, 2007, ¶ 12, Answer Ex. B, Docket #21).

Similarly, where a state court declines to address a state prisoner's federal claim for failure to meet state procedural requirements, the prisoner has procedurally defaulted on that claim for purposes of federal habeas relief, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (discussing the independent and adequate state ground doctrine).[3] A habeas petitioner who has procedurally defaulted on a federal claim in state court may also overcome that default by showing ineffective assistance of appellate counsel, "but only if that ineffectiveness itself constitutes an independent constitutional claim." *Edwards v. Carpenter*, 529 U.S. 446, 447 (2000). Here, it appears that Simmons procedurally defaulted in state court on his federal claim of ineffective assistance of trial counsel. Accordingly, as long as the Wisconsin Court of Appeals applied the proper United States Supreme Court precedents in a reasonable manner when it determined that Simmons had not established a claim of ineffective assistance of

---

[3]For reasons not readily apparent to the court, the Attorney General of Wisconsin has not discussed this rather complex issue of procedural default in opposing Simmons's petition.

-13-

appellate counsel, the court has no basis to grant Simmons habeas relief under 28 U.S.C. § 2254(d).

### 3.    Ineffective Assistance of Appellate Counsel

In his petition, Simmons claims that his appointed counsel on direct appeal, William Tyroler ("Tyroler"), was ineffective in failing to raise the issue of ineffective assistance of trial counsel on Simmons's direct appeal. Simmons claims that he told Tyroler to raise the issue to the Wisconsin Court of Appeals, but that Tyroler decided instead to pursue only Simmons's claims based on newly discovered evidence and improper sentencing. Specifically, Simmons argues that the same six grounds showing the unreasonable performance of his trial counsel, Chernin, also demonstrate the ineffectiveness of his appellate counsel, Tyroler.

Simmons does not allege that Wisconsin courts applied the incorrect legal standard to his ineffective assistance claim. Rather, Simmons petition asserts that Wisconsin courts unreasonably applied federal law governing ineffective assistance claims under the Sixth Amendment. A state court's application of federal law is unreasonable when it "identifies the correct governing legal principle from . . . [the Supreme Court's] . . . decisions but unreasonably applies that principle to the facts of petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citations and internal quotation marks omitted).

In its decision, the Wisconsin Court of Appeals rejected Simmons's contention that Tyroler was ineffective for not pursuing the issue of ineffective assistance of trial counsel on Simmons's first direct appeal. In doing so, the court of appeals purported

-14-

to follow the Supreme Court's teachings in *Strickland v. Washington*, 466 U.S. 668 (1984).  (Court of Appeals Decision, May 13, 2007, ¶ 12, Answer Ex. B, Docket #21).  Under *Strickland*, a petitioner alleging ineffective assistance of counsel must show that counsel's performance fell below reasonable professional norms, and that the petitioner suffered prejudice as a result of counsel's performance.  *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*, 466 U.S. at 687-88).  Rather than addressing the reasonableness of the acts or omissions of Simmons's counsel, the Wisconsin Court of Appeals focused on the prejudice prong of the *Strickland* framework.  As the court of appeals correctly noted, a court considering an ineffective assistance claim may dispose of it on either prejudice or performance grounds.  *See Strickland*, 466 U.S. at 697.  To establish prejudice, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  The probability of a different result is "reasonable" if it is "sufficient to undermine confidence in the outcome."  *Id.*

The court of appeals first addressed the four affidavits Simmons had submitted from potential defense witnesses who did not testify at his trial.[4]  The court of appeals found that only one of the potential witnesses, Brooks, claimed to have actually seen the shooting, and Brooks stated only that he might be able to identify

---

[4]As the court noted above, a fifth affidavit was also submitted by an individual claiming only to have overheard Simmons talking with a witness about the night of the shooting.  The court of appeals dismissed the relevance of this affidavit in a footnote of its decision, and Simmons has not demonstrated how such blatant hearsay could have been admitted at trial.

Case 2:07-cv-00604-JPS   Filed 03/27/09   Page 15 of 26   Document 58

the shooter.  The other witnesses, Wooten, Peel and Jones, only claimed to have witnessed Simmons getting into a red car, but did not claim to have witnessed the shooting.  The court of appeals questioned the credibility of all of Simmons's potential new witnesses, citing the fact that all of them were Simmons's friends, and the fact that none of them reported their versions of events to police.  The court of appeals held that "[b]ased on their affidavits, it is entirely possible that Simmons could have exited the red car, entered into the white one found abandoned later, and shot the victims."  (Court of Appeals Decision, May 13, 2007, ¶ 16, Answer Ex. B, Docket #21).   The court implicitly held that the affidavits, together, did not create a reasonable probability of a different result at trial and, therefore, Simmons had not suffered prejudice from his appellate counsel's decision not to raise the point on appeal that Simmons's trial counsel did not find and call those affiants as defense witnesses. (Court of Appeals Decision, May 13, 2007, ¶ 16, Answer Ex. B, Docket #21).

The court of appeals went on to briefly examine the conduct of Simmons's trial counsel and his postconviction appellate counsel, finding that both attorneys acted reasonably in searching out potential defense witnesses.  The court noted that Simmons only provided his trial counsel with the name and cell phone number of one of the persons from whom Simmons later elicited affidavits, and that Simmons's postconviction appellate counsel had looked into some of the witnesses and found them to be unhelpful to Simmons's case.  (Court of Appeals Decision, May 13, 2007, ¶ 17, Answer Ex. B, Docket #21).

Case 2:07-cv-00604-JPS   Filed 03/27/09   Page 16 of 26   Document 58

After reviewing the affidavits submitted by Simmons in support of his ineffectiveness of appellate counsel claim, as well as the written decisions of the circuit court and court of appeals, the court finds that the Wisconsin Court of Appeals reasonably applied the principles of *Strickland*. Having found the newly discovered witnesses to be less than fully credible, and having found their proffered testimony to be cumulative to evidence adduced at trial, the circuit court and court of appeals reasonably concluded that these new witnesses' testimony did not undermine confidence in the result of Simmons's trial. Accordingly, the court of appeals was also reasonable in finding no prejudicial effect from Simmons's postconviction counsel's choice not to present these new witnesses on appeal in the context of an ineffective assistance of trial counsel claim.

Next, the Wisconsin Court of Appeals addressed Simmons's contention that his appellate counsel was ineffective because he did not raise, on appeal, the ineffectiveness of trial counsel for failing to investigate and file a notice of alibi. Simmons claims that his trial counsel, Chernin, did not adequately investigate Simmons's alibi that he was on his way to the hospital at the time of the shooting, and that he also failed to file a notice of alibi as required by state statute. *See* Wis. Stat. § 971.23(8). Simmons also claims that he was not allowed to testify in his own defense because Chernin did not file a notice of alibi.

The court of appeals held that Simmons did not suffer any prejudicial effects from Chernin's failure to file a notice of alibi. The court found that Simmons was never prevented from testifying, but rather elected not to testify, and found that the

-17-

prosecutor never sought to limit the submission of evidence based on the lack of an alibi notice. (Court of Appeals Decision, May 13, 2007, ¶¶ 18-20, Answer Ex. B, Docket #21). The transcript record reflects that Simmons waived his right to testify in open court. (Transcript, February 7, 2001, 40, Answer Ex. J 45B, Docket #21). The court of appeals noted that the matters to which Simmons claimed he would have testified were presented to the jury through the testimony of Lindsey and through Chernin's cross-examination of Precious. The court also rejected Simmons's contention that the state would have conducted a more thorough investigation and dismissed all charges against him had Chernin filed a notice of alibi, finding it mere "wishful thinking." (Court of Appeals Decision, May 13, 2007, ¶ 20, Answer Ex. B, Docket #21). The court agrees, and finds that the Wisconsin Court of Appeals again reasonably applied *Strickland* principles. Having found that the lack of an alibi notice did not hinder Simmons's ability to testify, and that the prosecutor had never sought to exclude evidence on lack of notice grounds, the court of appeals reasonably concluded that Chernin's failure to file a notice did not have any impact on the result of Simmons's trial. Hence, Simmons's appellate counsel had no basis on which to claim ineffective assistance of trial counsel for Chernin's actions with respect to the notice of alibi.

Finally, the court of appeals addressed Simmons's assertion that his trial counsel was ineffective for failing to consult with him on trial strategy. Simmons claims that Chernin met with him only once for twenty minutes on the day his trial began and that the court of appeals improperly assumed that Chernin had spend

-18-

considerable time preparing for trial without Simmons.  Simmons also asserts that Chernin improperly advised Simmons not to testify.  The court of appeals again found that Simmons had not suffered prejudice from Chernin's relatively short consultation with Simmons, or from Chernin's advice not to testify.  The court noted that Simmons had waived his right to testify in open court, and only after the circuit judge explained that Simmons had the right to testify.  The court also found that Simmons's alibi was fairly presented at trial through Lindsey's testimony.  In summing up its conclusion that Simmons had suffered no prejudice from either his trial or appellate counsel's decisions, the court of appeals wrote that "[t]o be sure, conflicting evidence was introduced by the State and no physical evidence tied Simmons to the scene.  The jury was told of these deficiencies and they chose to accept the version of the events detailed by the State's witnesses."  (Court of Appeals Decision, May 13, 2007, ¶ 22, Answer Ex. B, Docket #21).

The court finds the Wisconsin Court of Appeals decision reasonable with respect to Simmons's claim that his trial counsel did not adequately consult with him on trial strategy.  Simmons argues that his situation is similar to that of the petition in *Washington v. Smith*, 219 F.3d 620 (7th Cir. 2000).  In *Washington*, the Seventh Circuit found the case presented by petitioner's defense counsel to be "crippled." *Id.* at 633.  In that case, the petitioner had testified at trial and provided an alibi, but his attorney failed to call a number of available and credible witnesses to corroborate the petitioner's story.  *See id.* at 633-34.  The court also found that counsel had not read a police report crucial to the case.  *See id.* at 634.  Unlike *Washington*, the state

-19-

court in this case found that the additional defense witnesses Simmons identified were not credible, and that Simmons's trial counsel had fairly presented Simmons's defense through cross-examinations and calling Lindsey to testify. Moreover, the court of appeals found, and Simmons's appellate counsel reiterated, that Simmons never made Chernin aware of all of Simmons's friends that could have been witnesses to the shooting. Simmons has not presented clear and convincing evidence to dispute these findings. *See Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (noting rebutable presumption that state court's factual findings are correct). Therefore, Simmons has not demonstrated that Chernin's pretrial investigation, his decisions on what witnesses to call, or his advice that Simmons not testify were anything other than sound trial strategies. *See Strickland*, 466 U.S. at 689 (noting presumption that actions of counsel at trial are product of trial strategy). While Chernin had a duty to consult with Simmons on important decisions and to keep Simmons informed on important decisions, trial counsel are given wide latitude in making tactical decisions. *See id.* at 688-89. The court of appeals was reasonable in finding that Chernin made sufficient efforts to consult Simmons in order to fairly present his defense. Subsequently, the court of appeals was also reasonable in not faulting Simmons's appellate counsel for not raising this issue on appeal.

Although the Wisconsin Court of Appeals cited Simmons's additional contentions, those contentions were never specifically addressed in its written decision. However, the court notes that irrespective of the sparseness of a state court's reasoning, a federal court is powerless to grant habeas relief as long as the

-20-

"state court's decision is at least minimally consistent with the facts and circumstances of the case." *Hammer v. Karlen*, 342 F.3d 807, 810 (7th Cir. 2003) (internal quotation marks omitted) (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)). Simmons had asserted that his appellate counsel should have claimed that trial counsel was ineffective for failing to pursue areas of impeachment in cross-examining testifying witnesses for the prosecution, failing to introduce prior inconsistent statements of those witnesses and failing to seek exclusion of certain prosecution witnesses. After considering these additional contentions, the court finds that the decision of the Court of Appeals was minimally consistent with the facts of Simmons's case, and that its overall application of *Strickland* to Simmons's case was reasonable.

Simmons argues that his trial counsel, Chernin, should have elicited additional testimony from Precious on Simmons's allegation that Precious had stolen money from Simmons in the past, and that Simmons had beaten up Precious. Respondent asserts that eliciting this testimony from Precious at trial would have strengthened evidence of Simmons's motivation to get revenge on Precious and her brother James as much as it would have undermined Precious's credibility. The court considers Chernin's decision not to delve into the details of Precious's alleged theft of Simmons's cash, and his subsequent beating of her, to have been a reasonable trial strategy. *See Strickland*, 466 U.S. at 689. Moreover, the record reflects that, on cross-examination, Chernin elicited from Precious that something happened

-21-

between the two of them, and that she wanted nothing to do with Simmons. (Transcript, February 6, 2001, 78-79, Answer Ex. J 44B, Docket #21).

Simmons also argues that Chernin was ineffective in pointing out inconsistencies in the testimony of prosecution witnesses. Simmons asserts that Precious and Crawley testified to more details than they originally offered to police at the time of the shooting. While in hindsight, the court agrees that Chernin could have cross-examined the prosecution witnesses differently, Simmons has not shown that Chernin's actual cross-examination demonstrated an unreasonable trial strategy. In fact, Chernin questioned Precious and Crawley about inconsistencies between their testimony and police reports, but both women stated that they did not remember what they told police immediately after the shootings. (Transcript, February 6, 2001, 80-82, 126-27, Answer Ex. J 44B, Docket #21). Therefore, the court finds no evidence that Chernin's cross-examination of prosecution witnesses was inadequate. Equally, the court finds that Simmons's appellate counsel was reasonable in deciding not to raise this issue on appeal.

Simmons next argues that Chernin should have investigated the law to better argue that Precious, James and Crawley should have been sequestered before testifying. Simmons claims that Precious and Crawley shaped their testimony to be consistent, because they were allowed to remain in the courtroom throughout each others' and James's testimony. Respondent asserts that Chernin did seek to have all witnesses in the case sequestered, but the circuit court judge refused based on a Wisconsin statute that allows victims to be present during trail. After reviewing the

-22-

transcript of Simmons's trial, the court is convinced that Chernin acted reasonably in seeking the sequestration of Precious, Crawley and James. Chernin moved to exclude witnesses from the courtroom before the trial, but the circuit court decided that excluding the victims was not necessary to provide Simmons a fair trial. (Pet'r Ex. 35, Docket #43). What is more, Chernin actually moved for a mistrial on the basis of non-sequestration of witnesses during the trial, which the circuit court denied on the basis of its previous ruling. (Transcript, February 6, 2001, 75-76, Answer Ex. J 44B, Docket #21). While the circuit court may have improvidently exercised its discretion in allowing key witnesses to remain in the courtroom, that error cannot be imputed on Chernin. The record reflects that Chernin vigorously argued to exclude Precious and Crawley from the courtroom. Therefore, the court finds no basis for a claim of ineffective assistance of trial counsel on this ground.

Finally, Simmons argues that the Wisconsin Court of Appeals erred in not considering the cumulative effect of trial counsel's, and thereby appellate counsel's, errors in assessing the prejudice suffered by Simmons. While it is true that a petitioner may demonstrate ineffective assistance by showing the cumulative effects from individual acts or omissions of counsel, *see Williams v. Washington*, 59 F.3d 673, 683 (7th Cir. 1995), Simmons has not made a sufficient showing to demonstrate that the acts and omission of either Chernin, his trial counsel, or Tyroler, his appellate counsel, in the aggregate were sufficient to place the result of Simmons's trial or appeal in reasonable doubt. Moreover, viewing Simmons's petition as a whole, Simmons has not shown that the result of his trial was

-23-

fundamentally unfair or unreliable.  *See Lockhart v. Fretwell*, 506 U.S. 364, 369

(1993) (holding that courts addressing prejudice must consider whether the result

of a criminal proceeding is fundamentally unfair or unreliable).  The court agrees with

the finding of every state court that has examined Simmons's case: given the

additional evidence that Simmons's claims should have been presented at trial, the

evidence against Simmons remains more than sufficient to uphold his conviction.

Even if Simmons had sufficiently shown his trial counsel to be ineffective,

Simmons has not demonstrated that his appellate counsel was ineffective for not

raising a claim of ineffective assistance of trial counsel on direct appeal.  While his

appellate counsel, Tyroler, certainly could have raised such a claim, the court is

mindful that appellate counsel is not required to raise every nonfrivolous claim on

appeal.  *See Smith v. Robbins*, 528 U.S. 259, 287-88 (2000).  Rather, appellate

counsel may choose among all nonfrivolous claims on appeal to maximize the

likelihood of success.  Therefore, a petitioner claiming ineffective assistance of

appellate counsel must show "that a particular nonfrivolous issue was clearly

stronger than issues that counsel did present."  *Id.* at 288.

Here, Simmons has submitted portions of several letters from Tyroler, in which

Tyroler provides his rationale for raising only the issues relating to Simmons's

sentencing and the circuit court's denial of an evidentiary hearing based on newly

discovered evidence.  In those excerpts, Tyroler explains his belief that the two

issues he presented on appeal were stronger than Simmons's claim of ineffective

assistance of counsel.  Tyroler wrote that after investigating Simmons's complaints

-24-

relating to Chernin's performance, he was not convinced that an ineffective assistance claim would be successful on appeal.  (Pet'r Ex. 15, 17, 18, Docket #43).

Because Simmons has not shown that his ineffective assistance of trial counsel claim was clearly stronger than the claims his appellate counsel actually raised on appeal, the court finds that the Wisconsin Court of Appeals reasonably concluded that Simmons's appellate counsel was not ineffective.  The Wisconsin Court of Appeals also reasonably concluded that Simmons procedurally defaulted on his claim of ineffective assistance of trial counsel.  As a result, the court finds no basis on which to issue a writ of habeas corpus, and the court is obliged to deny Simmons's petition in its entirety.

**4.     Motions to Appoint Counsel and for Extension**

Simmons moves the court to appoint Robert Henak as his counsel for the purpose of representing Simmons during any evidentiary hearing the court may order. (Docket #54).   Because the court finds that no evidentiary hearing is necessary to resolve Simmons's petition on the merits, the court denies Simmons's motion to appoint counsel as moot.

Simmons also moved for a 45-day extension of time to file his reply brief. (Docket #50).  On April 29, 2008, the court granted Simmons's request to file a reply brief within 30 days of service of respondent's opposition brief.  Respondent served his opposition on June 17, 2008.   As grounds for the extension, Simmons stated that he needed extra time to better acquaint himself with the law through fellow inmates and use of the prison law library.  The court grants Simmons's motion to

Case 2:07-cv-00604-JPS   Filed 03/27/09   Page 25 of 26   Document 58

extend. Simmons filed his reply brief on July 31, 2008, and the court has taken into account the arguments contained therein in reaching its conclusion.

Accordingly,

**IT IS ORDERED** that Simmons's motion for extension of time to file a reply brief (Docket #50) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Simmons's motion to appoint Robert Henak as counsel for the purposes of an evidentiary hearing (Docket #54) be and the same is hereby **DENIED** as moot; and

**IT IS FURTHER ORDERED** that Simmons's petition for a writ of habeas corpus (Docket #1), be and the same is hereby **DENIED** and this case is hereby **DISMISSED** on the merits.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge